# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | | |
|---|---|---|
| **WALTER G. LANG,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case number 4:04cv0924 TCM** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of Jo Anne B. Barnhart, the Commissioner of Social Security ("Commissioner"), denying, in part, Walter G. Lang's applications for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and supplemental security income benefits ("SSI") under Title XVI of the Act, 42 U.S.C. §§ 1381-1383b.  Mr. Lang ("Plaintiff") has filed a brief in support of his complaint; the Commissioner has filed a brief in support of her answer.[1]

## Procedural History

Plaintiff applied in May 1997 for DIB and SSI, alleging a disability since November 1989 caused by diabetes, diabetes retinopathy, neuropathy, sleep apnea, depression, stress, high blood pressure, numbness in his hands and feet, high cholesterol, and chest pain.  (R.

---

[1]The case is before the undersigned for a final disposition pursuant to the written consent of the parties.  See 28 U.S.C. § 636(c).

at 75-77, 112-14.)[2]  His applications were denied.  (Id. at 59-63, 65-68, 98-102, 105-09.)

Subsequently, a hearing was held, at Plaintiff's request, in March 1998 before Administrative

Law Judge ("ALJ") James E. Seiler.  (Id. at 29-57.)  The ALJ determined that Plaintiff was

not under a disability at any time on or before the date of his decision, and denied his

applications.  (Id. at 18-23.)  The Appeals Council denied Plaintiff's request for review of

that decision, effectively adopting the ALJ's decision as the final decision of the

Commissioner.  (Id. at 6-9.)

Plaintiff then requested judicial review of that decision.  In September 2001, this

Court remanded the case for an ALJ to reevaluate Plaintiff's subjective complaints; reassess

his psychiatric problems; explain any discrepancies between that reassessment and that of

a consulting examiner; and elicit, if necessary, the testimony of a vocational expert ("VE").

In March 2003, a second administrative hearing was held before ALJ J. Brad Griffith.

(Id. at 464-522.)  The ALJ found that as of May 16, 1997, Plaintiff had severe impairments

of diabetes with upper and lower extremity neuropathy.  (Id. at 449.)  These impairments

precluded him from engaging in a significant range of jobs at the sedentary level;

consequently, he was disabled as of that date.  (Id.)  Prior to May 16, Plaintiff had severe

impairments of diabetes with lower extremity neuropathy, but was not disabled as defined

in the Act.  (Id.)

---

[2]References to "R." are to the administrative record filed by the Commissioner with her answer.

It is undisputed that Plaintiff met the disability insurance status requirements through December 31, 1994, but not thereafter. Consequently, the ALJ's decision that Plaintiff was disabled as of May 16, 1997, precludes Plaintiff from receiving DIB. It is this decision that Plaintiff now challenges.

Plaintiff's testimony at the first hearing, the forms he completed pursuant to his DIB and SSI applications, and the medical records were summarized by this Court in <u>Lang v. Massanari</u>, 4:00cv1036 TCM (E.D. Mo. Sept. 13, 2001), and will be repeated here only as relevant to the question of the disability onset date.

## **Testimony Before the ALJ**

Plaintiff testified at the first administrative hearing in 1998 that he was born in April 1949 and was then 49 years old. (<u>Id.</u> at 33.) He had completed two years of college and was living with his parents. (<u>Id.</u>) He had had no special job training. (<u>Id.</u>) With the exception of one month in 1994, he had not worked since 1989. (<u>Id.</u> at 34.) His last job was as an operations manager for a building maintenance company. (<u>Id.</u>)

Plaintiff and James E. Israel, a VE,[3] testified at the second, 2003 administrative hearing.

Plaintiff's testimony focused on the period between 1989 and June 1998.[4] During that time period, he lived with his parents. (<u>Id.</u> at 467-68.) He had studied accounting in college.

_____

[3]Plaintiff had no objections to Israel's qualifications as a VE.

[4]Plaintiff had been found disabled as of June 1998 pursuant to a second SSI application.

(Id. at 468.)  He left his last accounting job in 1989 because of his health problems, including diabetes, retinopathy, and diabetic foot ulcers.  (Id. at 469.)  The health problems adversely affected his work performance, and he was fired.  (Id. at 479.)  He tried to find other work.  (Id.)  He was never hired after the prospective employers discovered he had diabetes.  (Id.)  His weight also was a problem when he applied for other jobs.  (Id. at 486.)  Later in the hearing, Plaintiff further testified that his felony conviction in 1989 for fraudulent use of a credit card also had something to do with him stopping work.  (Id. at 512.)  After he stopped work, he applied for unemployment benefits but was denied.  (Id. at 509.)

He was able to work between 1983 and 1989 with his diabetes.  (Id. at 470.)  That all changed, however, when he was hospitalized with foot ulcers.  (Id.)  Additionally, his vision became worse.  (Id. at 471.)  For instance, if he looked at a number, part of the number would be obscured.  (Id.)  The physicians at Barnes Hospital tried to treat his retinopathy with laser treatments.  (Id. at 472.)  He had sixteen treatments in his right eye and two in his left.  (Id.)  Approximately four of the treatments were after 1998.  (Id.)  The first was in 1989.  (Id. at 473.)  He was also always falling down then due to his foot ulcers.  (Id. at 474.)  The ulcers were treated with antibiotics.  (Id. at 475.)  The ulcers never completely closed, however, and he continues to have problems with them.  (Id.)  The pain caused by the ulcers was a burning or stinging sensation.  (Id.)  His diabetic neuropathy reduced the feeling in his foot.  (Id. at 476.)  He sometimes has to wear shoes with the toes cut out to avoid any rubbing against his feet.  (Id.)

The neuropathy affects his fingertips, the palms of his hands, and his lower legs down to his toes. (Id. at 476.) It causes numbness, tingling, and pain. (Id.) It hurt to write. (Id. at 478.) The orthopedist recommended surgery, but his other physicians disagreed based on his infection and cellulitis. (Id. at 477.)

In 1989, Plaintiff could not walk longer than ten minutes and could not sit in one place for longer than fifteen minutes. (Id. at 477-78.) He sometimes used an assistive device to help him walk, but it was of little use. (Id. at 477.)

Plaintiff further testified that, as of 1989, he had always lived with his parents. (Id. at 480.) He had tried to help with the housework and cut the grass. (Id.) He stopped cutting the grass because he would get blisters which would turn into foot ulcers. (Id.) He did some of the shopping; his mother did most of the cooking. (Id.)

He sought psychiatric help in 1989. (Id. at 482.) The psychiatrists told him he was depressed because of his numerous illnesses. (Id.) One recommended treatment was to decrease his blood sugar levels. (Id.) He was then taking pills and insulin. (Id.) He continued to have psychological problems in 1994. (Id. at 487.) He was depressed and could not sleep. (Id.)

As of 1994, Plaintiff was still able to drive. (Id. at 483.) He first testified that his right eye was good but not as good as the left eye. (Id.) His left eye had to compensate sometimes for his right eye's tendency to block out portions of letters or numbers. (Id. at 484.) He wore corrective lenses. (Id.) When it was noted that his description of his vision

problems in 1994 was similar to the description for 1989, Plaintiff further explained that his eyes had gotten worse.  (Id.)

In 1994, Plaintiff was still suffering from neuropathy in his hands and legs.  (Id.)  It had gotten to the point where he was disabled.  (Id.)  He spent his time the same way he had in 1989, i.e., watching television and listening to the radio.  (Id. at 485.)  The chores he did had decreased.  (Id.)  He was also short of breath.  (Id.)  He attributed this problem to his weight.  (Id.)  At the time of the hearing, he weighed 310 pounds and was under 6 feet tall.  (Id.)  He estimated that he weighed about 260 to 270 pounds in 1994.  (Id.)

He was diagnosed with kidney problems sometime before 1994.  (Id. at 488-89.)  At first there were no symptoms.  (Id. at 489.)  Gradually, his need to urinate increased to six to eight times during the night.  (Id.)

The medications he took made him tired and gain weight.  (Id. at 490.)  They also made his legs and ankles swell.  (Id.)

When asked about any other problems that he had in 1994 that he did not have in 1989, Plaintiff replied that he developed high cholesterol and triglycerides.  (Id.)  This caused him digestive problems, bloating, irritable bowel syndrome, headaches, and additional problems with balance.  (Id. at 491.)

Plaintiff's health became worse between 1994 and 1996.  (Id. at 491.)  His blood sugar was high and he was still depressed.  (Id.)  He had never been hospitalized for depression, although he had seen a psychiatrist when hospitalized for foot ulcers in 1997 or 1998.  (Id. at 492-93.)  He would periodically try to find work in 1996.  (Id. at 493.)  He would answer

advertisements and go to interviews.  (Id.)  He did not find any jobs.  (Id.)  He last applied for a job in 1996 or 1997.  (Id. at 509.)  The job was probably an accounting job.  (Id. at 510.)  He was not engaged in any self-employment during the relevant period of time.  (Id.)

He was still able to drive, albeit on a limited basis.  (Id. at 494.)  His balance was worse.  (Id.)  He fell a lot.  (Id. at 495.)  And, he still had foot ulcers.  (Id.)  Consequently, he would have to elevate his feet three or four times a day for at least two hours.  (Id.)  This would help some.  (Id. at 496.)  His hands and fingers were still numb and stiff.  (Id.)  His legs were weak.  (Id. at 497.)

Additional deterioration in his health and the depletion of his financial resources led to him applying for benefits in 1997.  (Id.)  He had more problems with his eyes, higher blood pressure readings, higher cholesterol counts, and higher triglycerides.  (Id.)  He was still getting psychiatric care.  (Id. at 498.)  The medicine he had been taking to control his blood sugar had been taken off the market, and the new medication was helping quite a bit.  (Id.)

Plaintiff testified that a sleep apnea machine had helped him get a better night's sleep for awhile, but then had stopped working.  (Id. at 506.)  It stopped helping in the 1980's.  (Id. at 507.)  When reminded that he had been diagnosed with sleep apnea in 1994, Plaintiff clarified that the machine had stopped helping four or five years ago.  (Id.)  At that point, he had been using it for a couple of years.  (Id.)  He had sporadically tried using the machine again, but it did not help.  (Id. at 508-09.)

James Israel testified as a VE. He testified that a person of Plaintiff's age, education, and work experience who was restricted to sedentary work would be able to perform thousands of jobs that required his accounting, bookkeeping, and general clerical skills. (Id. at 516.) If that same person had visual limitations, particularly in the right eye, that caused the person to misread numbers out of one eye, there were no jobs that the person could perform. (Id. at 517-18.)

Plaintiff's counsel asked the VE to additionally assume that this person, in 1994, had a decreased walking ability caused by excess weight, was so preoccupied with his illnesses that he would sometimes forget to take his insulin shot, needed to urinate four to five times a day, was unsteady when walking or getting out of chairs, and would not be able to operate any pedal controls. (Id. at 519-20.) The VE replied that there were no jobs that this person could do. (Id. at 520.)

## Medical and Other Records Before the ALJ

As part of the application process, Plaintiff completed several reports, including a pain report, disability report, and function report. In the pain report, he described his pain as constant and as an aching, stabbing, burning, stinging, cramping, throbbing, and crushing pain. (Id. at 157.) The pain occurred in his legs, arms, hands, lower back, and left kidney area. (Id.) In the disability report, Plaintiff listed four hospitalizations – the shortest for four days, the longest for seventeen. (Id. at 193.) He also listed three treating physicians: Gary Tobin, M.D., for his diabetes; Henry Kaplan, M.D., for his retina problems; and Michael Jarvis, M.D., for his psychiatric problems. (Id. at 188, 190, 194.) He listed seven

prescription medications: three were for his diabetes; one was for his heart; one was for his high blood pressure; one was for a fungus infection; and one was for depression. (Id. at 200.) Additionally, he had undergone an EKG, a treadmill test, a vision test, an EEG, an MRI of his stomach, a CT scan of his stomach, an x-ray of his feet and legs, and a breathing test. (Id. at 201-02.) In the function report, Plaintiff noted that his impairments have also adversely affected his ability to drive or use public transportation. (Id. at 179.)

Plaintiff was hospitalized in 1989, 1993, 1996, and 1997. The first hospitalization was for nine days in 1989 when Plaintiff was admitted for treatment of an infection in his right foot. (Id. at 282-94.) An x-ray of that foot showed no fracture, dislocation, or bony or soft tissue abnormalities. (Id. at 291.) Plaintiff was again admitted to the hospital in 1993 for treatment of an infection, this time in his left foot. (Id. at 410.) In May 1996, Plaintiff was hospitalized for a diabetic foot ulcer. (Id. at 264-79.) An x-ray of his right foot showed no evidence of osseous destruction or fracture or any soft tissue defect suggestive of ulceration. (Id. at 278.) The discharge summary noted that Plaintiff had a history of sleep apnea with questionable compliance with the CPAP machine. (Id. at 264.) He refused to use the CPAP machine when in the hospital. (Id.) In 1997, Plaintiff was hospitalized in April for seventeen days for treatment of a diabetic foot lesion and left ankle cellulitis and again in June for seven days for treatment of a diabetic foot ulcer. (Id. at 213-62.) It was noted on his April admission that he had insulin-requiring diabetes mellitus with historical poor control and that he had been medically noncompliant with his prescribed insulin

regimen. (Id. at 238.) Plaintiff was referred to a psychiatrist. (Id. at 235.) An occupational therapist noted on June 6 that Plaintiff had difficulty writing. (Id. at 226.)

Plaintiff was treated by Dr. Kaplan at the Barnes Retina Institute from November 1990 to August 1997 for treatment of his diabetic retinopathy. (Id. at 315-60.) He routinely received laser photocoagulation treatment. (Id.) His visual acuity in 1991 ranged from 20/40 to 20/60 in his right eye and from 20/25 to 20/30 in his left eye. (Id. at 343-54.) The acuity fluctuated with his sugar levels. (Id. at 347.) He had floaters in his right eye and occasionally in his left eye. (Id. at 349, 351, 353.) In 1992, his visual acuity ranged from 20/40 to 20/50 in his right eye and from 20/25 to 20/30 in his left eye. (Id. at 333-42.) He continued to complain of floaters and cobwebs on sunny days. (Id.) Blurred vision was inconsistently a problem. (Id.) In January 1993, Plaintiff's visual acuity was 20/40 in his right eye and 20/25 in his left eye. (Id. at 331.) In January 1994, his visual acuity remained the same as the year earlier. (Id. at 328.) He was reportedly "doing very well." (Id.) In July 1996, Plaintiff was still bothered by visual cobwebs and floaters in his right eye. (Id. at 318.) In March 1997, Plaintiff's condition was reported to be stable.

Dr. Tobin began treating Plaintiff in January 1994. In the course of that treatment, he referred Plaintiff to Dr. Kaplan for his visual difficulties, to a podiatrist and to an orthopaedic surgeon for his foot problems, and to a specialist in sleep disorders for his sleep apnea. In June 1996, the podiatrist treated an ulcer on his leg with antibiotics. (Id. at 382.) In 1997, the orthopaedic specialist, Jeffrey E. Johnson, M.D., recommended a heel cord lengthening procedure and a period of casting. (Id. at 372-74.) He noted that Plaintiff was

going to consider his options but did not want to undergo surgery. (Id. at 372.) A sleep test at the Washington University Sleep Disorders Laboratory in 1994 revealed that, due to the presence of moderate to severe obstructive sleep apnea, Plaintiff slept just 2.4 hours during the test. (Id. at 400.) Marked improvement in Plaintiff's sleep resulted from his use of a CPAP machine. (Id. at 403.)

In May 1995, Dr. Tobin told Plaintiff to start losing weight. (Id. at 390.) In December 1995, Dr. Tobin increased Plaintiff's insulin to twice a day. (Id. at 388.) In October 1996, Dr. Tobin wrote that he needed Plaintiff to be more vigilant in his diabetes care. (Id. at 379.) In July 1997, Dr. Tobin noted that he was pleased with Plaintiff's progress on his diet. (Id. at 366.) In August, Plaintiff showed a good response to a blood sugar medication. (Id. at 363.) This increased compliance was due to his improved mood. (Id.) And, he had lost a few pounds by walking after his feet had healed. (Id.) In October, he described Plaintiff's neuropathy in his hands and feet as "severe." (Id. at 362.)

Plaintiff had a recurrent ulcer at his February 1998 visit to Dr. Tobin. (Id. at 417.) On examination, he had severe neuropathy and early left foot drop. (Id.) A report in March 1998 described the results of a 24 hour urine test – "significant" diabetic kidney disease was present. (Id. at 422.) When Dr. Tobin saw Plaintiff in July 1998, he noted that Plaintiff "continues to have decreased ambition and remains in counseling to assist in medical compliance." (Id. at 430.) Plaintiff was regularly taking his insulin and had no recent ulcerations on his feet. (Id.) To lessen his visual problems, he was told to decrease his use of aspirin – he was taking "6-9 aspirin for chronic greater than 1 year duration back pain."

(Id.) Dr. Tobin included in his list of impressions "[p]ersonality disorder (await further input from Dr. Jarvis)." (Id. at 433.) Dr. Tobin separately wrote to support Plaintiff's application for disability benefits. (Id. at 434.) "[Plaintiff] faces a bleak prognosis unless the diabetic control can be improved. He is being treated in a multifaceted multi specialty approached [sic] to the complications of diabetes. Complicating our treatment Plan is [Plaintiff's] psychiatric illness." (Id.)

As noted above, Dr. Jarvis began seeing Plaintiff when he was hospitalized in April 1997. He then began seeing him monthly. (Id. at 412-16, 425-26.) Plaintiff was diagnosed with major depression. (Id. at 412.) In February 1998, Dr. Jarvis insisted on Plaintiff's participation in a psychiatric partial hospital program due to his recalcitrance and lack of motivation to do anything for himself. (Id. at 425.)

As part of the application process, Plaintiff was evaluated by a psychologist, Alison Burner, M.A. (Id. at 304-07.) She concluded that Plaintiff had mild depression but did not appear to have a psychological disorder that would preclude him from obtaining or maintaining employment. (Id. at 306.)

### The ALJ's Decision

Employing the five-step sequential evaluation process, described below, the ALJ first found that Plaintiff had not engaged in substantial gainful activity after 1989. (Id. at 445.) Addressing the second step of the process, the ALJ discussed the severity of Plaintiff's impairments.

The relevant objective medical evidence fails to fully support his allegations about the severity of his symptoms and limitations prior to May 16, 1997. Generally, the undersigned notes that before the date the claimant was last insured for benefits his symptoms regarding retinopathy were not significant and his foot ulcers were intermittent. The undersigned also notes that the claimant had both conditions when he worked. More specifically, the undersigned notes that his foot infections did not affect the bone, as x-rays of his right foot in October 1989 and in May 1996 were normal. X-ray in April 1997 revealed only mild diffuse soft tissue swelling.

Similarly, examinations failed to reveal signs of vision problems as severe as alleged. . . . The claimant reported on January 19, 1994, that his vision remained well since July 1993. August 17, 1994, the claimant's vision was 20/32 and 20/25.

In addition, the undersigned notes that examinations prior to May 1997 failed to reveal signs of significant neuropathy for his upper extremities.

The undersigned notes that examinations failed to reveal significant abnormalities that would be expected to result in the severity of shortness of breath alleged. Pulmonary function tests in October 1989 revealed forced vital capacity (FVC) 82 percent of predicted and forced expiratory volume in one second (FEV1) 89 percent of predicted. Chest x-rays in 1989, in 1996, and in 1997 revealed no significant disease. Examiners observed that the claimant was obese. Few, however, observed that his obesity resulted in significant work-related limitations.

Examiners did not observe that the claimant had significant limitations in his daily activities, social functioning, concentration, persistence, and pace. Examiners noted the claimant was alert and oriented. In 1997 Alison Burner, M.A., a licensed psychologist, diagnosed the claimant with dysthymia and indicated he had only mild symptoms of a psychological disorder.

(Id. at 446.)

The ALJ concluded that Plaintiff's treatment history failed to support his allegations.

(Id. at 447.) Specifically, Plaintiff's testimony that he broke down when he lost his job was

not accompanied by any mental health treatment or psychiatric medication. (Id.) And,

although Plaintiff was diagnosed with major depression, that diagnosis was in 1997 and was accompanied by a recommendation that Plaintiff reduce his alcohol intake and do volunteer or part time work.  (Id.)  Plaintiff's treatment history did include many references to his non-compliance with treatment and to a reduction in his symptoms when he did comply.  (Id.)  Additionally, the ALJ concluded that inconsistencies in Plaintiff's statements lessened his credibility.  (Id.)  For instance, Plaintiff stated one reason in an application form for stopping work, i.e., the "'employer created stress by eliminating health care and profit sharing,'" another reason when questioned by his attorney, and yet another reason when questioned by the ALJ.  (Id.)  Also, at the administrative hearing, Plaintiff denied any legal problems after the fraud charge but an examination note on July 15, 1989, indicated that Plaintiff was in trouble after being caught shoplifting.  (Id.)  He denied during a consultative examination any legal problems at all.  (Id.)  He testified at the administrative hearing that he had not played drums or played in a band after the 1970's; however, the record includes a reference in October 1989 to the saxophone man in his band and his mother reported that he was more involved than before in playing his drums.  (Id.)

The ALJ next concluded, Plaintiff had a severe impairment of diabetes with lower extremity neuropathy before May 16, 1997.  (Id. at 447.)  His other impairments, including his depression, had no more than a minimal affect on his ability to perform work-related activities.  (Id. at 448.)  His severe impairment was not of listing level severity, however, as required to end the evaluation process at step three.

Before May 16, 1997, Plaintiff had the residual functional capacity to lift and carry no more than 10 pounds, to sit for up to 6 hours in an 8 hour workday, and to stand or walk for up to 2 hours in an 8-hour workday. (Id.) The determination at step four of the process of whether he could return to his past relevant work was aided by the testimony of the VE. Based on that testimony, the ALJ concluded that Plaintiff could return to his past work as a bookkeeper as it generally is performed in the national economy. (Id.) Before May 16, 1997, he was not, therefore, disabled within the meaning of the Act. (Id. at 449.)

## Legal Standards

Under the Social Security Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. §§ 416.920, 404.1520. See also **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002); **Cox v. Apfel**, 160 F.3d 1203, 1206 (8th Cir. 1998). First, the claimant cannot be

presently engaged in "substantial gainful activity." See 20 C.F.R. §§ 416.920(b), 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. §§ 416.920(c), 404.1520(c). The Social Security Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . ." Id. (alteration added). "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on her ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. §§ 416.920(d), 404.1520(d), and Part 404, Subpart P, Appendix 1. If the claimant meets this requirement, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

At the fourth step, the ALJ will "review [claimant's] residual functional capacity ["RFC"] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e) and 416.920(e). "[RFC] is what the claimant is able to do despite limitations caused by all the claimant's impairments[,]" **Lowe v. Apfel**, 226 F.3d 969, 972 (8th Cir. 2000) (citing 20 C.F.R. § 404.1545(a)) (alteration added), and requires "a function-by-function assessment based upon all of the relevant evidence of an individual's ability to

do work-related activities,'" **Depover v. Barnhart**, 349 F.3d 563, 565 (8th Cir. 2003) (quoting S.S.R. 96-8p)).  "[RFC] 'is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'"  **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (quoting McCoy v. Schweiker, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc)) (alteration added).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility regarding subjective pain complaints.  **Ramirez**, 292 F.3d at 580-81; **Pearsall**, 274 F.3d at 1217.  This evaluation requires that the ALJ consider "(1) a claimant's daily activities, (2) the duration, frequency, and intensity of pain, (3) precipitating and aggravating factors, (4) dosage, effectiveness, and side effects of medication, and (5) residual functions."  **Ramirez**, 292 F.3d at 581 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted)).  Although an ALJ may not disregard subjective complaints of pain based only on a lack of objective medical evidence fully supporting such complaints, "an ALJ is entitled to make a factual determination that a Claimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  **Id.**  See also **McKinney v. Apfel**, 228 F.3d 860, 864 (8th Cir. 2000) ("An ALJ may undertake a credibility analysis when the medical evidence regarding a claimant's disability is inconsistent.").  And, although a claimant need not be reduced to life in front of the television in order to prove that pain precludes all productive activity, see **Baumgarten v. Chater**, 75 F.3d 366, 369 (8th Cir.

1996), "[t]he mere fact that working may cause pain or discomfort does not mandate a finding of disability," **Jones v. Chater**, 86 F.3d 823, 826 (8th Cir. 1996) (alteration added).

After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. <u>See</u> **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998). The decision of an ALJ who seriously considers, "but for good cause expressly discredits, a claimant's subjective complaints of pain, is not to be disturbed." **Haggard v. Apfel**, 175 F.3d 591, 594 (8th Cir. 1999).

The burden at step four remains with the claimant. <u>See</u> **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001); **Singh**, 222 F.3d at 451. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." **Pearsall**, 274 F.3d at 1217.

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks**, 258 F.3d at 824. <u>See</u> <u>also</u> 20 C.F.R. §§ 416.920(f), 404.1520(f). The Commissioner may meet her burden by referring to the medical-vocational guidelines or by eliciting testimony by a vocational expert. **Pearsall**, 274 F.3d at 1219.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court if it is supported by "substantial evidence on the record as a

whole." **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001); **Clark v. Apfel**, 141 F.3d 1253, 1255 (8th Cir. 1998). "Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a decision." **Cox**, 160 F.3d at 1206-07. When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the court must also take into account whatever in the record fairly detracts from that decision. **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999); **Baker v. Apfel**, 159 F.3d 1140, 1144 (8th Cir. 1998). The court may not reverse that decision merely because substantial evidence would also support an opposite conclusion. **Dunahoo**, 241 F.3d at 1037; **Tate v. Apfel**, 167 F.3d 1191, 1196 (8th Cir. 1999); **Pyland v. Apfel**, 149 F.3d 873, 876 (8th Cir. 1998). Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 244 F.3d 891, 894-95 (8th Cir. 2000) (alteration added).

## Discussion

Plaintiff argues that the ALJ failed to comply with Social Security Ruling 83-20 and consequently erred in his determination of Plaintiff's disability onset date. The Commissioner disagrees.

"The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations." Soc.Sec.Rul. 83-20. "Factors relevant to the determination of disability onset include the individual's allegation, the work history, and the medical evidence." Id. "[T]he individual's allegation or the date of work stoppage is significant in determining onset only if it is consistent with the severity of the condition(s) shown by the medical evidence." Id. "[T]he expiration of insured status is not itself a consideration in determining when disability first began." Id.

The ALJ determined that Plaintiff had a disability onset day of May 16, 1997. Plaintiff counters that the proper date is before December 31, 1994. For the reasons set forth below, substantial evidence on the record as a whole supports the ALJ's determination.

The medical evidence does not support a claim of disabling impairments prior to May 16, 1997. Plaintiff had foot ulcers prior to that day; however, as noted by the ALJ, they were intermittent. He had an infection in his right foot in 1989. An x-ray showed no fracture, dislocation, or bony or soft tissue abnormalities. Four years later, in 1993, he was treated for an infection in his left foot. Three years later, in 1996, he was hospitalized for a diabetic foot ulcer. During the years from 1989 through 1995, he received no other medical care for his feet. During those same years, he did receive regular care for his retinopathy. Although

he consistently complained of floaters and cobwebs, his visual acuity was never worse than 20/60. That was in 1991, eight years before Plaintiff stopped working. Additionally, the records reflect that the acuity improved when Plaintiff's blood sugar levels improved, and he had a record of poor compliance with his diabetes control treatment. Plaintiff was diagnosed with sleep apnea in 1994. The records also reflect that the apnea was markedly improved when Plaintiff used a CPAP machine.

Without supporting medical evidence, a finding of a disability onset date before December 31, 1994, depends, in the instant case, on Plaintiff's descriptions of his limitations. The ALJ found, however, that these descriptions were not credible.

In addition to the lack of supporting medical evidence – a proper consideration when assessing a claimant's credibility, see **Stephens v. Shalala**, 50 F.3d 538, 541 (8th Cir. 1995); **Barrett v. Shalala**, 38 F.3d 1019, 1022 (8th Cir. 1994), the ALJ considered Plaintiff's lack of compliance with treatment, see **Tellez v. Barnhart**, 403 F.3d 953, 957 (8th Cir. 2005); **Raney v. Barnhart**, 396 F.3d 1007, 1011 (8th Cir. 2005), and the inconsistencies that were apparent in the evidence as a whole, **Black v. Apfel**, 143 F.3d 383, 387 (8th Cir. 1998). All these considerations weighed against Plaintiff's credibility.

Also detracting from that credibility was Plaintiff's application for unemployment benefits. The Eighth Circuit Court of Appeals found in **Barrett v. Shalala**, 38 F.3d 1019, 1024 (8th Cir. 1994), that a claimant's application for unemployment benefits, a document requiring that the applicant state that he or she was capable of working and seeking work,

was inconsistent with the claimant's allegations of disability during the same period. Although Plaintiff vigorously argues that the receipt of unemployment benefits should not be, and is not, incompatible with an application for SSI or DIB, this Court is bound to follow the law of the Eighth Circuit that an application for unemployment benefits may weigh against a claimant's credibility.

## Conclusion

Considering all the evidence in the record, including that which detracts from the ALJ's conclusions, the Court finds that there is substantial evidence to support the ALJ's decision that prior to May 16, 1997, Plaintiff was not disabled within the meaning of the Act. Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is AFFIRMED and this case is DISMISSED.

An appropriate Judgment shall accompany this Memorandum and Order.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this 26th day of August, 2005.